IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF (1) THE PREMISES LOCATED AT 1298 SMYTH ROAD, BUILDING 2, UNITS 16-17, HOOKSETT, NH; (2) THE PERSON OF SHENG AN CHEN (DOB: █████1987); AND (3) A BLACK 2021 LEXUS RX WITH FLORIDA PLATE 85AEZU | Case No. __25-mj-140-1-TSM__<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR SEARCH WARRANTS

I, Special Agent Bradley Nims, being duly sworn, do depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations (HSI) and have been employed by HSI since April 2018.  I am currently assigned to the HSI Office in Manchester, NH. I have attended 22 weeks of specialized training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia where I graduated from both the Criminal Investigator Training Program (CITP) and the HSI Special Agent Training (HSISAT) program. I was provided formal training in multiple disciplines including money laundering, narcotics trafficking, and fraud investigations. Part of this training included the use of electronic communication devices to facilitate these crimes. I have a bachelor's degree in Criminal Justice and a master's degree in Security and Resilience Studies.

2.      In connection with my official duties, my investigations have involved the use of surveillance techniques and the execution of various search, seizure, and arrest warrants. I have investigated and assisted other agents in numerous cases involving a wide variety of criminal violations including narcotics trafficking, money laundering, illegal importation/exportation of goods, bank fraud, mail fraud, and wire fraud. Based on my training and experience, I am

familiar with the methods used by money launderers, including laundering proceeds that are part

of large-scale organized schemes. I have received specialized training regarding investigative

techniques, evidence collection, and evidence preservation. I communicate constantly with other

agents, law enforcement officers, and intelligence analysts in both the private sector and the

government to learn new information about current trends and activities associated with money

laundering and fraud schemes.

3.    I am familiar with the facts and circumstances of this investigation, and I have

received information from a variety of sources, including but not limited to other law

enforcement officers, non-law enforcement retail investigators, and agents.  In addition, I have

reviewed records and reports relating to this investigation.  Other law enforcement agents have

similarly reviewed records and reports and relayed their contents to me.

4.    This affidavit is intended to show only that there is sufficient probable cause for

the requested warrants and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

5.    I make this affidavit in support of an application for search warrants to search the

following locations and items:

  a. The entire premises located at 1298 Smyth Road, Building 2, Units 16-17,

     Hooksett, New Hampshire ("SUBJECT PREMISES"), as more particularly

     described in ATTACHMENT A-1;

  b. Sheng An CHEN, a/k/a You Chun CHEN, an Asian male born ▮▮▮▮▮ 1987,

     who is listed as 5'06", weighing approximately 140 pounds, and having no hair

     (bald), and brown eyes, as more particularly described in ATTACHMENT A-

     2; and

c. A black 2021 Lexus RX bearing Florida registration number 85AEZU (hereinafter the "TARGET VEHICLE"), registered to Sheng An CHEN, as more particularly described in ATTACHMENT A-3.

6. Based on my training and experience, and the facts set forth below, there is probable cause to believe that the SUBJECT PREMISES, the person of Sheng An CHEN, and the TARGET VEHICLE, contain evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 1341, 1343, 1349, 1956, and 1957 (mail fraud, wire fraud, money laundering, and related conspiracies) (the "TARGET OFFENSES").

## PROBABLE CAUSE

### Background – Chinese Gift Card Fraud

7. Based upon my training and experience, conversations with other law enforcement, and knowledge of other investigations, I am aware that a common tactic within Organized Retail Crime (ORC) includes the exploitation of stolen and/or fraudulently-obtained gift cards to make purchases of high-valued merchandise, such as Apple brand electronics and cell phones. This merchandise is then in turn sold to others in the United States and abroad. The end-purchaser(s) of these devices typically have no knowledge of the original fraud.

8. While there are varying levels of sophistication and methods of conducting these gift card scams, one such method involves the coordinated efforts of entering a retail establishment and stealing hundreds, if not thousands, of inactive gift cards from their display racks. The gift card number, PIN number, and other pertinent information are recorded into a computer program that repeatedly checks the retailer's website to determine when a customer makes a legitimate purchase of the compromised card by adding money to it. The card is then subsequently either repackaged or restored to its original condition and brought back to a retail

3

establishment and placed back on the shelves for sale.

9.      At this point, an unsuspecting customer will select a gift card off the shelf, add funds to it at checkout, and leave the store. Once the program tips off the fraudster that the gift card has been loaded with money, the card details are either used in an online purchase or electronically disseminated to co-conspirators who are sent to make in-person purchases at retail locations. The original physical gift card is not necessary for use by co-conspirators as the pertinent information has been obtained and can be transmitted to other co-conspirators' electronic devices, such as cell phones. High value electronic items such as Apple iPads, iPhones, and computers are often purchased and shipped or brought back to a central location for distribution and resale.

10.      Other methods utilized in these schemes involve the utilization of stolen funds or proceeds of illicit activity (such as hacking, romance or elder fraud, and sextortion) to purchase physical or electronic gift cards. These gift cards are then used online or disseminated to individuals who are sent to make purchases online or at physical retail locations.  This is a form of money laundering, as the gift cards conceal the source of the illicitly obtained funds.  Using gift cards raises less suspicion than using bulk currency to make large volume purchases of high-value electronic items. Similarly, by using gift cards, fraudsters can avoid using credit cards which are linked to an actual identity. The inherent anonymity of gift cards makes tracing of the stolen funds extremely difficult and thus, attractive tools for money laundering. The individuals who make the retail purchases using the gift cards are paid a small sum of money, often for each device that they turn over to the organizer(s) of the scheme.

11.      Throughout the duration of my investigation, which began on December 28, 2023, law enforcement executed searches of multiple New Hampshire warehouses that were routinely

4

receiving high volumes of fraudulently obtained Apple electronics.  These Apple electronics were all purchased using gift cards that are all suspected to be stolen or fraudulently obtained.

12.    Through interviews of several subjects, including individuals who have pleaded guilty, and witnesses, my investigation has shown that fraudsters are directing electronics to be shipped to New Hampshire warehouses due to the state's lack of sales tax.

13.    My investigation has further shown that there appears to be multiple groups of Chinese nationals or persons of Chinese descent operating these warehouses.  I will refer to these individual groups as "cells."

14.    To date, law enforcement has seized well over 10,000 brand-new Apple electronics from various New Hampshire warehouses. Law enforcement sent many of the seized electronics' serial numbers to Apple.  Apple confirmed that over 120,000 gift cards were used to purchase these devices, totaling over $13,000,000.00 in gift card funds. These were devices seized from six warehouses between two cells. Data is still pending for the order details from additional search warrant locations in this investigation. There are believed to be numerous other warehouses and cells currently operating in New Hampshire based on conversations with FedEx, UPS, and Apple, as well as records obtained from those entities.

15.    The cards used to purchase the seized devices were originally purchased or acquired from across the United States, and usually shortly before the Apple devices themselves were purchased.  However, most of these cards were redeemed in China following their activation in the U.S. Some of the gift cards used to acquire Apple electronics for shipment to New Hampshire were used in as little as 24 hours after acquisition, despite being purchased in regions far away from New Hampshire.

16.    Although tracing of the Apple devices back to the original gift card owners has

proven to be challenging, law enforcement has spoken with several victims whose gift cards were used to purchase electronics that were confirmed to have gone to these New Hampshire warehouses.

17.    As part of this investigation, law enforcement executed search warrants on personal phones seized from New Hampshire warehouse workers.  Searches of the phones have revealed commonalities among each cell involved in the gift card fraud scheme.

18.    The cells of Chinese nationals operating New Hampshire warehouses all use WeChat, a Chinese-based messaging platform that does not comply with U.S. legal process. Those communications include photographs, texts, and emails.  In some instances, the WeChat messages contain strings involving various groups that both purchased and exchanged fraudulently-obtained gift card numbers and PINs.  WeChat participants have cautioned others about using the cards, cautioning that the cards may be confiscated or deemed invalid.   For example, one cell shared a link to Homeland Security Investigations' Project Red Hook website, which is HSI's broader initiative to combat Chinese organized crime groups who are exploiting gift cards to launder money.

19.    This investigation is a part of Project Red Hook.

20.    The cells' WeChats also discussed the sale and purchase of electronic devices, primarily Apple products.  Other conversations included messages about New Hampshire-based warehouses and where to ship and/or bring devices to.  There are also numerous discussions mentioning FedEx shipments.  Photographs of pricing charts for electronics were also found within these WeChat conversations.

21.    Additionally, the nominal recipients listed on the shipping labels at the warehouse locations were largely all different persons, with some clearly being fictitious persons, such as

6

"Chicken" and "Tree" listed as the first names. Other names have been a jumbled array of random letters that do not resemble any sort of name.

22.    According to Apple, none of the New Hampshire warehouses identified to date as part of this investigation, including the SUBJECT PREMISES, are authorized wholesalers, retailers, or resellers of Apple.

23.    Law enforcement has also interviewed workers at several of the New Hampshire warehouses (not including the SUBJECT PREMISES) receiving large quantities of Apple products. Most claimed to simply be "re-shippers" who get paid a commission per device, anywhere from $5 to $10. According to the workers, their bosses are typically in China. The workers primarily communicate with their purported bosses through WeChat and usually do not know the bosses' real names. Several individuals have advised law enforcement they are aware the devices are likely stolen or illegally obtained. Interviews also revealed that this type of scheme relies heavily on the use of electronic devices, such as cell phones, to facilitate purchasing and exchanging fraudulent gift card data and the subsequent purchase and shipment of electronics purchased with the fraudulent gift cards.

24.    Additionally, searches of personal phones seized from the broader investigation showed the cells operating in New Hampshire frequently purchased gift card data with cryptocurrency. Cryptocurrency can only be accessed through electronic devices.

25.    Despite claims from several of warehouse workers and operators about being mere "re-shippers" that do not own the Apple electronics flowing through the warehouses, evidence from their seized personal devices indicate at least some of them are purchasing Apple devices using gift cards and reselling them as the beneficial owner. This discovery was based on invoices located within their devices and traditional financial analysis obtained from bank

7

records.

26.     Other common evidence found throughout other warehouses in New Hampshire include informal, handwritten ledgers with pages of gift card information and transactions from major retailers such as Walmart, Target, and Best Buy.  These warehouses also track shipment quantities and device descriptions.  Due to the voluminous amounts of incoming shipments, most warehouses used dumpsters on the premises to dispose of the carboard shipping boxes.  During interviews, many neighbors of these warehouses voiced their frustrations about these workers routinely filling up the dumpsters.

27.     Finally, each warehouse involved in this investigation to date has been found to either export the devices overseas directly, primarily to China or Dubai, or ship the devices to Miami, FL, where they are then later exported overseas, primarily to South America.

28.     The proceeds generated from the final sale of the electronics to the consumer obfuscates the origin of the illegally obtained funds used to purchase the merchandise. All parties involved throughout this cycle, including the initial fraudsters, the gift card dealers, the merchandise re-shippers, and the gray-market importers, profit along the way. A gray market involves selling genuine products through channels not authorized by the manufacturer, and usually at a discount. Unlike the black market, which deals with illegal items, gray market goods are legitimate but are distributed outside approved networks.

**Attempted Robberies & Thefts Involving Illicit Apple "Re-Shippers"**

29.     Since beginning this investigation, I am aware of several robberies or attempted robberies in New Hampshire and elsewhere targeting these Apple "re-shippers."  One such incident occurred on April 7, 2025, at 51 Harvey Road, Unit F, Londonderry, NH.  During this robbery, the robbers can be heard from the unit's video surveillance system asking where the

phones are and telling an accomplice over the phone that there were no phones there.  At least one suspect can be seen holding a gun, and an Asian female warehouse worker was zip-tied during the robbery.  It is believed that this robbery was an attempt to hit Unit D at that same address.  Unit D is a known warehouse used to receive and ship large amounts of Apple products.

30. On May 19, 2025, another robbery attempt occurred at 4 Peabody Road, Unit 2, in Derry, NH. That morning, FedEx and UPS delivered approximately 672 iPhones. Shortly after the final delivery, a U-Haul van pulled up and three subjects exited and approached one of the warehouse workers near his car. After a short altercation, the Asian warehouse worker was stabbed multiple times and was later pronounced deceased at Elliot Hospital in Manchester. The subject who stabbed him was later identified as involved in the aforementioned Londonderry robbery attempt.

31. On June 27, 2025, a robbery attempt was made in Sweetwater, FL, at a location that had just received hundreds of Apple electronics from a New Hampshire based "re-shipper" that law enforcement has been tracking. The FBI in Miami confirmed that the phones that were being pursued had shipping labels from an address in Salem, NH, as well as an address in Oregon.  The robbers wore Michael Myers masks and zip tied the Asian workers.  Police arrived during the robbery and shots were fired by the police. The suspects carjacked a vehicle and were later captured following a police pursuit. One of the suspects was shot by the police.

32. Other robberies over the past year have been successful in stealing Apple products in New Hampshire.  One such robbery occurred in early 2025 in Manchester where the robbers pushed a FedEx delivery driver to the ground while she was delivering Apple phones to a purported Asian re-shipper.

9

33.    Another robbery occurred in Londonderry in 2024 where a purported Asian re-shipper was robbed bringing boxes of iPhones into the Londonderry FedEx.  The robber stole the phones as the re-shipper was attempting to drop them off.

34.    On July 6, 2025, the UPS facility located at 3 Whipple Street in Nashua, NH was broken into at just prior to midnight and several subjects wearing masks are observed running through the UPS facility.  It was later discovered that they stole over 600 iPhones that were slated for delivery to several purported "re-shippers" that law enforcement has been tracking.

35.    Oregon is another state with no sales tax.  I have spoken with law enforcement in Oregon and learned that there are other similar purported re-shippers operated by persons of Chinese descent there.  Robbers targeting the Apple devices are also stealing from warehouses/re-shippers in Oregon.

### Apple Products Sent to the SUBJECT PREMISES

36.    In July 2025, information was obtained from Apple, FedEx, and UPS regarding daily bulk Apple shipments to 1298 Smyth Road, Building 2, Units 16-17, Hooksett, NH (the "SUBJECT PREMISES"). Records obtained from Apple indicate that the SUBJECT PREMISES received 12,719 Apple devices from May 1, 2025 to July 17, 2025, totaling $15,809,929.45.

37.    For example, based on records provided by Apple, consider the following 20 shipments of Apple devices that were ordered on June 19, 2025 and delivered to the SUBJECT PREMISES:

    i.  All 20 orders were funded entirely with gift cards. Each order was linked to a separate Apple ID account. However, the devices were purchased either by uploading the gift cards onto the Apple ID wallet or by using the gift cards directly without pre-uploading them to the account wallet. All 20 Apple orders

reviewed were placed on June 19, 2025.

ii. 12 of the 20 orders uploaded the gift cards to an Apple ID wallet first and then purchased the devices from the wallet balance. These 12 Apple ID accounts utilized 120 gift cards total to place the 12 orders in question. The denominations of these gift cards ranged from $10 to $500. All gift cards were originally purchased from various merchants in the U.S., such as Walmart, CVS, and Dollar General, and were activated in the U.S. However, all were redeemed in China and Hong Kong. The oldest card activated in these 12 Apple ID wallet orders was from May 21, 2025. However, 117 of the 120 cards used were activated June 14, 2025 or later, which is within five days of the order date. 42 cards were activated on June 18, 2025 (the day of the orders) and June 19, 2025.

iii. The discrepancy between some of the gift cards showing as activated on June 19, 2025, but being used for purchases on June 18, 2025, is believed to be caused by the 12-hour time difference between China and United States Eastern Daylight Time. It is believed that the actors involved in this scheme use the cards quickly before they are frozen by the card vendor or store merchant.

iv. The remaining eight orders were funded directly with gift cards without first uploading them to an Apple ID wallet. These eight orders utilized 137 gift cards total. The denominations of these gift cards ranged from $0 to $500. Numerous gift cards in these transactions showed a gift card balance of $0. According to Apple, it is believed these $0 gift cards were an attempted use of that card despite the cards not having any funds on them. Apple did not provide activation and redemption data for these direct gift card purchases.

11

v.  12 of the 20 orders were for iPhone 16 Pro 128 GB at a cost of $999 per phone. Seven purchases were for the same phone, but 256 GB and at a cost of $1,199 each. The last purchase was for an iPhone 16 Pro 1TB at a cost of $1,599.

vi.  In the "Bill To" customer information for these 20 orders, every order included a different name, email, address, and phone number. The physical addresses were from different areas and states across the U.S., despite them all being shipped to SUBJECT PREMISES. Nine of the 20 "Bill To" addresses listed the SUBJECT PREMISES. A review of the other "Bill To" addresses identified an invalid zip code for the address listed as 903 Chapmans Lane, Albuquerque, NM 87100. According to the U.S. Postal Service (USPS) website, the zip code 87100 is not a valid U.S. zip code. Albuquerque, NM uses 87106.

vii.  A review of the "Bill To" phone numbers listed for each order further indicate fraud. All orders included different phone numbers. However, seven of the 20 orders have "0000" as the last four digits. One order lists "9999" as the last four. According to multiple online sources, including the North American Numbering Plan Administration (NANPA), 12 of the 20 phone numbers listed in these orders do not have U.S.-assigned area codes. This is odd considering all the associated "Bill To" addresses are in the U.S. Further, only one of the remaining eight U.S. assigned area codes aligns with the state of the listed "Bill To" address from that order (the aforementioned NM address with the invalid zip code). The "Bill To" phone numbers are also all the same as the "Ship To" phone numbers.

viii.  In the "Ship To" section, all 20 orders were shipped to SUBJECT PREMISES 1. Despite 20 different "Bill To" emails and phone numbers, nine of the 20 orders

12

were sent to one person: "Martin Ma." Other "Ship To" names included "Wendy Edwards", "Gibson BOB", and "leite hamu," among others. However, nine of the remaining 11 orders not shipped to "Martin Ma" listed "Bldg 2-#16 Maaa" in the "Ship to Street Name." The remaining two of 20 orders that did not include a "Ma" or "Maaa" in the order used the names "leite hamu" and "zhao hu." These were the only two names that did not capitalize the first letters of the first and last name. All the other "Ma" and "Maaa" orders did. Many of the email addresses listed in these orders also appear to be bogus, such as gkhjhjfghgdfd76@yackk.com, fgjhjhjhhjgf56@yackk.com, or wybtrbtwtrbwe654@yackk.com. The emails used for both the "Bill To" and "Ship To" customers remained the same.

38.    Based on the foregoing, I believe these orders are fraudulent. I further believe these 20 orders are representative of all 12,719 orders shipped to the SUBJECT PREMISES between May and July 2025. This analysis is similar to the information received from Apple based on the previous search warrants executed in this investigation.

## Surveillance of the SUBJECT PREMISES

39.    Surveillance of the SUBJECT PREMISES has confirmed heavy shipping volume of incoming packages from Apple by FedEx and UPS. Surveillance has also confirmed that occupants of the SUBJECT PREMESES are picking up packages from the FedEx Express shipping center at 10 Industrial Drive in Londonderry, NH.

40.    The activity for the SUBJECT PREMISES is constant and routine. The lessee of the SUBJECT PREMESIS has been identified as Sheng An CHEN (DOB ████ 1987). A second unidentified Asian male has also been observed during surveillance assisting with the retrieval of

packages. Based on surveillance, I believe that this unidentified individual lives at the SUBJECT PREMISES. A primary vehicle associated with the SUBJECT PREMESES is a black 2021 Lexus RV SUV with Florida plate 85AEZU (the TARGET VEHICLE), registered to Sheng An CHEN at 4909 Tribute Trail, Kissimmee, FL 34746.

41.    Surveillance of the SUBJECT PREMISES revealed the following:

i.    On May 28, 2025, an investigator noted that the SUBJECT PREMISES had multiple surveillance cameras attached to the unit. Surveillance cameras were observed at both the front and rear of the unit, to include a "doorbell camera" on the front access door. No vehicles were observed on the exterior of the SUBJECT PREMISES.

ii.    On May 30, 2025, at approximately 9:40 am, the TARGET VEHICLE exited the garage bay of the SUBJECT PREMISES. The TARGET VEHICLE drove towards the Manchester Boston Regional Airport. At approximately 3:07 pm, a FedEx delivery truck was observed in front of the garage door to the SUBJECT PREMISES. The garage door was partially opened and it appeared that packages were being unloaded into the SUBJECT PREMISES.

iii.    On June 2, 2025, at approximately 9:40 am, a large UPS delivery truck was observed at the SUBJECT PREMISES. Two Asian males were observed assisting the UPS driver with unloading small packages into a large bin. Several bins were brought into the SUBJECT PREMISES on a dolly. At approximately 9:56 am, the TARGET VEHICLE could be seen leaving the garage bay of the SUBJECT PREMISES. At approximately 2:43 pm, a FedEx truck was observed

14

parking in front of the SUBJECT PREMISES. Several small packages were brought to the front door and a male could be observed claiming the packages.

iv.  An interview was conducted with the landlord of the SUBJECT PREMISES. The landlord indicated that he is aware of two Asian males who sleep inside of the SUBJECT PREMISES. The landlord identified one of the Asian males as Sheng An CHEN. The second male remains unidentified.  According to the landlord, the TARGET VEHICLE remains parked inside of the SUBJECT PREMISES and no other vehicles used by CHEN and the unidentified Asian male have been observed at the SUBJECT PREMISES.  The landlord stated that the subjects associated with the SUBJECT PREMISES have been observed routinely filling the property's dumpster with large quantities of cardboard boxes.

v.  On June 25, 2025, at approximately 3:15 pm, investigators were at the FedEx located at 10 Industrial Way in Londonderry, NH. The investigators were advised by FedEx employees that numerous boxes were just dropped off minutes earlier from individuals operating the SUBJECT PREMISES warehouse.  These FedEx employees are familiar with the individuals operating the SUBJECT PREMISES, as well as other "reshippers," as they see them on a near-daily basis. Investigators observed the labels on these boxes, which included all the same information:

> 1.  Sender: Raymond Jiang
> Address: 6210 NE 92nd Dr Ste 105, Portland, OR 97220
> Phone: (929) 341-8307
> Recipient: Top Cell
> Address: 2858 NW 72nd Ave, Miami, FL 33122
> Phone: (347) 242-5977

Shipping Details:
Carrier: FedEx
Service: Priority Overnight
Ship Date: June 23, 2025
Delivery Date: June 24, 2025, by 10:30 AM
Weight: 43.00 lbs
Dimensions: 16x12x12 inches
Tracking Number: 8822 3870 6064

vi.  Not one label listed the SUBJECT PREMISES as the return address.  This is believed to be a deliberate tactic to conceal and layer the shipping source of the Apple devices. This tactic has also been observed in other warehouses in New Hampshire as part of my investigation into fraudulent gift cards being used to purchase Apple products.

vii.  On July 1, 2025, at approximately 10:15am, investigators observed the TARGET VEHICLE arriving at the FedEx in Londonderry. FedEx employees advised the investigators that this was the vehicle from the SUBJECT PREMISES arriving to pick up packages from Apple. Upon pickup, FedEx asked the subject for an ID, which was provided to investigators. The subject was identified from his New York driver's license as Sheng An CHEN (DOB: ███ 1987). He then proceeded to pick up a quantity of packages that FedEx advised were all from Apple and addressed to the SUBJECT PREMISES.

viii.  Based on surveillance conducted at SUBJECT PREMISES, this location receives deliveries from UPS, and FedEx Ground in both the morning and afternoon hours. In addition, Sheng An CHEN has been observed retrieving packages from the FedEx Express center in Londonderry, NH in the morning hours.

**TECHNICAL TERMS**

16

42.     Based on my training and experience, I use the following technical terms to convey the following meanings:

i.    Internet Protocol Address: An Internet Protocol address ("IP address") is a unique numeric address used by devices on the Internet. Every device attached to the Internet must be assigned a public IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. An IP address acts much like a home or business street address— it enables devices connected to the Internet to properly route traffic to each other. Devices connected to the Internet are assigned public IP addresses by Internet service providers ("ISPs"). There are two types of IP addresses: IPv4 (Internet Protocol version 4) and IPv6 (Internet Protocol version 6). An IPv4 address has four sets ("octets") of numbers, each ranging from 0 to 255, separated by periods (e.g., 149.101.82.209). An IPv6 address has eight groups ("segments") of hexadecimal numbers, each ranging from 0 to FFFF, separated by colons (e.g., 2607:f330:5fa1:1020:0000:0000:0000:00d1).

ii.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

iii.    Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

17

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

43.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, the person of Sheng An CHEN, and the TARGET VEHICLE (collectively, the "SEARCH LOCATIONS"), in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

44.    Probable cause.  I submit that if a computer or storage medium is found on or in the SUBJECT LOCATIONS, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

i.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

ii.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are

18

overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

iii.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

iv.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

v.    Based on actual inspection of other evidence related to this investigation, including spreadsheets, financial records, invoices, labels, and others, I am aware that computer equipment was used to generate, store, and print documents used in the TARGET OFFENSES.  There is reason to believe that there is a computer system currently located on or in the SEARCH LOCATIONS.

45.    Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium in the

SEARCH LOCATIONS, because:

    i.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    ii.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence

is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide

21

relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

iii.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

iv.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

v.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the

22

presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

46.     Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      i.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      ii.    Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software,

and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

iii.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

47.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## UNLOCKING DEVICES

48.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

24

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners and facial recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. Based on my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked

26

device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

49.     Based on the foregoing, I believe that the SUBJECT PREMISES, which is described more fully in Attachment A-1, the person of Sheng An CHEN, which is described more fully in Attachment A-2; and the TARGET VEHICLE, which is described more fully in Attachment A-3, contain items described in Attachment B that constitute evidence, fruits, or instrumentalities of the TARGET OFFENSES.  Accordingly, I respectfully request that this Court issue a search warrant authorizing the search of the SUBJECT PREMISES, the person of Sheng An CHEN; and the TARGET VEHICLE, for the items described in Attachment B.

Respectfully submitted,

/s/Bradley Nims
Special Agent Bradley Nims
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Talesha L. Saint-Marc
U.S. Magistrate Judge
District of New Hampshire

28

## ATTACHMENT A-1
(Description of Property to be Searched)

1298 Smyth Road Building 2, Units 16-17 Hooksett, NH (the SUBJECT PREMISES) is located in a commercial park in Hooksett, NH. Units 16-17 are cojoined and have no dividing walls between both units. The units each feature a lofted second story at the rear of each unit. Each unit features a white garage door at the front in addition to an entrance door. The rear of each unit features a small window and a door.   The building has a grey sheet metal exterior and a grey roof. The front walk-through door to each unit is white with the numbers 16 and 17 being clearly visible above the doors. The two garage bay doors have three evenly spaced windows spread across its width. The parking lot is paved. The SUBJECT PREMISES is depicted in the image below.  There is a red arrow pointing to the garage bay door and a green arrow pointing to the front walk-through door for both Unit 16 and Unit 17.



# ATTACHMENT A-2
(Description of Person to be Searched)

Sheng An CHEN, aka You Chun CHEN, is an Asian male born ███████ 1987, who is listed as 5'06", weighing approximately 140 pounds, and having no hair (bald), and brown eyes, according to law enforcement databases.



# ATTACHMENT A-3
(Description of Property to be Searched)

The TARGET VEHICLE is a black 2021 Lexus RX bearing Florida registration number 85AEZU and vehicle identification number ("VIN") 2T2AZMAA2MC216691.  This vehicle is registered to a Sheng An CHEN at an address of 4909 Tribute Trail, Kissimmee, FL 34746. The TARGET VEHICLE is depicted in the image below, with a red arrow pointing to the TARGET VEHCILE



# ATTACHMENT B
(Description of Items to be Seized)

The items to be searched for and seized are the following:

1.      All records relating to violations of 18 U.S.C. §§ 1341, 1343, 1349, 1956, 1957 (mail fraud, wire fraud, money laundering, and related conspiracies), those violations involving **Sheng An CHEN and other co-conspirators,** and occurring after **January 1, 2025**, including but not limited to (1) books; (2) records; (3) correspondence; (4) ledgers; (5) logs; (6) journals; (7) shipping labels; (8) invoices; (9) accounts payable and receivable; (10) financial statements; (11) contracts or agreements between buyers and sellers; (12) receipts; (13) phone records; and (14) address records;

2.      All records pertaining to the acquisition, use, or transmission of gift cards;

3.      All records pertaining to the use or transmission of cryptocurrency;

4.      All records pertaining to the use or transmission of fiat currency, including through wire or check;

5.      All packages in retail boxes or containers;

6.      All packages in shipping boxes or containers;

7.      All devices capable of communications via WeChat, including but not limited to personal cell phones;

8.      Electronics contained in their original packaging, to include cell phones (such as iPhones), laptops (such as Mac laptops), AirPods, Apple Watches, tablets, printers, scanners, smart watches, gaming consoles, GPS devices, and headphones;

9.      Indicia of occupancy, residency, and/or ownership of the SUBJECT PREMISES, including but not limited to (1) identification documents, (2) driver licenses, (3) passports, (4)

32

utility and telephone bills, (5) deeds, (6) leases, (7) rental agreements, (8) photographs, and (9) keys which tend to show the identities of the occupants, residents, and/or owners. This search warrant shall include a search of any and all persons encountered at the SUBJECTS PREMISES, which will be limited in scope for the purpose of retrieving the aforementioned identification items;

10.    Financial records including bank statements, bank receipts, passbooks, bank checks, money market or similar accounts, money drafts, letters of credit, payroll documents, employment information, income and expense records, Federal and State income tax returns, money orders, cashier checks, loan applications, credit card records, safety deposit boxes;

11.    U.S. currency, cryptocurrency, or any and all monetary instruments, or other items of value used in, or intended for use in, or derived from mail fraud, wire fraud, money laundering, and related conspiracies;

12.    Virtual currency and related records of any kind, to include: any and all representations of virtual currency public keys or addresses, whether in electronic or physical format; any and all representations of virtual currency private keys, whether in electronic or physical format; any and all representations of virtual currency wallets or their constitutive parts, whether in electronic or physical format, to include "root keys" which may be used to regenerate wallet;

13.    PGP keys and/or encryption passwords or keys of any kind; and

14.    Packing material, postal records or inserts relating to any shipping.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.      evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.      evidence of the times the COMPUTER was used;

i.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.      records of or information about Internet Protocol addresses used by the COMPUTER;

l.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.      contextual information necessary to understand the evidence described in this attachment.

n.      Routers, modems, and network equipment used to connect computers to the Internet.

During the execution of the search of the SUBJECT PREMISES and persons described in Attachments A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.